1

2

3                                                              O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,      )   Case No. CR 05-00757 DDP
                                     )
12                   Plaintiff,      )   **ORDER DENYING PETITIONERS'S**
                                     )   **MOTION TO EXPUNGE, SEAL AND**
13        v.                         )   **DESTROY ARREST RECORDS**
                                     )
14                                   )   [Docket No. 87 & 88]
     JULIA DAVIS and BOBBY JOE       )
15   DAVIS,                          )
                                     )
16                   Defendants.
     _____

17

18        Presently before the Court is Petitioners's Motion to

19   Expunge, Seal and Destroy Arrest Records (the "Motion"). For the

20   reasons stated in this order, Petitioners's Motion is DENIED.

21

22   **I.   Factual Background**[1]

23

24

25   _____

26        [1]The underlying factual and procedural history of this case
     and related civil and criminal litigation is lengthy and
27   convoluted. The Court has summarized what appear to be the relevant
     events here. In doing so, the Court has drawn both from the
28   parties' submissions on this Motion and Judge Virginia Phillips'
     Summary Judgment Order in related civil litigation. Judge Phillips'
     Order was used for additional clarity and completeness in this
     Court's understanding of the facts.

Petitioners Julia and BJ Davis are a married couple.[2] BJ Davis is a producing member of the Academy of Television Arts and Sciences. (Docket No. 88, at 14.) Julia Davis is a former federal employee for the Department of Homeland Security ("DHS") and the Bureau of Customs and Border Protection at the Port of San Ysidro. (Id. at 34.)

While serving as an employee of DHS, Julia was the target of sexual harassment by her supervisor. (Id.) When she reported this harassment to Port management, she was told an investigation would be launched into the matter, which apparently never happened. (Id.) On an unspecified date, Julia filed a complaint against DHS with the Equal Employment Opportunity Commission ("EEOC"). (Id.) In June 2005, Julia prevailed on the EEOC action and received over $225,000 in damages. (Id.) DHS was ordered to develop sexual harassment policies and procedures, as well as establish a training program on the topic. (Id. at 35.)

In June 2004, Julia sent the Port Director a letter expressing her concerns over the removal of metal detectors and X-ray machines as well the reduction in security staff at the Port. (Judge Phillips' Order for Partial Summary Judgment, Case No. 07-CV-00481(VAP)(OPx) ("Judge Phillips' Order"), at 16.) Later that same month, Julia sent the DHS Office of the Inspector General ("OIG") a letter regarding her observation of an Assistant Port Director instructing an agent to falsify an individual's nationality on various documents. (Id.) On July 5, 2004, Julia

---

[2]This Court refers to the Petitioners Julia and BJ Davis by their first names for clarity. By doing so, the Court in no way intends to disrespect Petitioners.

wrote a letter to the Federal Investigation Bureau ("FBI") reporting an unusually high number of individuals from special interest countries entering the United States through the Port over the July 4th holiday. (Id. at 17.) A reporter for the Los Angeles Times received this letter and confronted the CBP Commissioner about it at a press conference. (Id.) It was around that same time that the CBP launched its own investigation into Julia, which Julia believed to be in retaliation for her complaints regarding sexual harassment in the workplace and her reporting of security issues at the Port. (Id.)

In January 2005, Agent Jeffrey Deal ("Agent Deal") began investigating both Julia and BJ for charges of potential marriage fraud based on information he received from the CBP Office of the General Counsel. (Id. at 22.) After his investigation, Agent Deal concluded that Julia paid BJ $10,000 to marry her and subsequently filed an immigration petition with the United States. (Id.)

As the result of Agent Deal's investigation, the U.S. Attorney charged Julia with conspiracy, unlawful procurement of citizenship as well as aiding and abetting in the unlawful procurement of citizenship. (Id.) Furthermore, the U.S. Attorney charged BJ with conspiracy and unlawful procurement of citizenship. (Id. at 23.) On August 9, 2005, Julia and BJ were indicted by a federal grand jury on these charges and warrants for their arrests were issued. (Id.) Agents Deal and Herbert Kaufer ("Agent Kaufer") sought to use the Immigration and Customs Enforcement ("ICE") Special Response Team ("SRT") to assist in executing the arrest warrants, citing as their rationale the fact

1   that Julia was a former federal officer and BJ's alleged prior

2   conviction for first-degree murder. (Id.)

3        On August 10, 2005, ten DHS Internal Affairs Agents, a U.S.

4   Marshal, seventeen SRT members, eight unmarked cars and a

5   Blackhawk helicopter arrived at the Davis residence to execute

6   arrest warrants for both Petitioners. (Docket No. 88, at 101.)

7   When authorities conducted this search, neither Julia nor BJ was

8   home. (Id.) However, Mykola Kot and Galyna Kovalska, Julia's

9   parents, were present at the Davis home during the search. (Id.)

10  While conducting their search of the Davis home, ICE Agents seized

11  one Remington shotgun and seven rounds of ammunition found in the

12  master bedroom. (Judge Phillips' Order, at 25.)

13       The couple eventually self-surrendered to U.S. Marshal

14  custody on August 16, 2005 and were released later that day.

15  (Gov't Opp'n, at 3.) On March 3, 2006, the government moved to

16  dismiss all federal charges against both Julia and BJ without

17  prejudice. (Id.) A few days later, on March 7, 2006, this Court

18  granted the government's application for dismissal. (Id.) Aside

19  from post-dismissal actions regarding appearance bonds and

20  protective orders, there have been no other substantive filings in

21  this case until Petitioners filed the instant motion on August 5,

22  2013. (Id.)

23       Meanwhile, charges were also brought against the Davises in

24  state court. (Judge Phillips' Order, at 27) On December 9, 2005,

25  Agent Wong mailed a letter to a Supervisory Deputy District

26  Attorney in San Bernardino County. (Id.) This letter informed the

27  District Attorney that agents seized a loaded Remington shotgun

28  from the Davis home during the search on August 5, 2013. (Id.) It

4

also stated that this was a probable violation of the California
Penal Code because BJ was a convicted felon not permitted to
possess a firearm. (Id. at 27-28.)

On January 25, 2006, the Government filed a felony complaint
state court, charging both BJ and Julia with violating California
Penal Code § 12021(a)(1) after both were purportedly convicted of
manslaughter on June 21, 1974 in Louisiana. (Id. at 29.)[3] On
November 2, 2006, the Superior Court granted both Julia and BJ's
petitions to seal and destroy records of this arrest. (Id.)
Furthermore, both Julia and BJ were declared factually innocent of
the state charges pursuant to Cal. Penal Code § 851.8. (Id.)

After their federal and state criminal charges were
dismissed, the Davises filed a civil suit on April 23, 2007
against the two investigating agents and the United States, Case
No. 07-CV-00481(VAP)(OPx), Julia & Bobby Joe Davis v. U.S.A. &
Jeffrey Deal. (Gov't Opp'n. at 3.) After years of litigation, the
parties reached an undisclosed settlement agreement on February
18, 2010. (Id. at 4.) Judge Virginia A. Phillips dismissed the
action on February 19, 2010. (Id.)

Petitioners now seek expungement, along with the destruction
of records pertaining to their arrests on August 16, 2005.
Petitioners further seek to have the records pertaining to the
grand jury indictment destroyed. This indictment charged Julia
with conspiracy, 18 U.S.C. § 371; unlawful procurement of

---

[3]Though it is unclear from the record before the Court what
happened in the state case, the Court presumes that Petitioners'
state criminal charges were dismissed or that Julia and BJ were
acquitted, as the state court granted their Motion for Expungement
as well as declared both Julia and BJ factually innocent.

citizenship, 18 U.S.C. § 1425(b); and aiding and abetting unlawful procurement of citizenship, 18 U.S.C. §§ 2(a), 1425(b). The indictment further charged BJ with conspiracy, 18 U.S.C. § 371 and unlawful procurement of citizenship, 18 U.S.C. 1425(b). (Docket No. 1)

**II. Legal Standard**

Defendants seeking expungement are essentially requesting "the judicial editing of history." United States v. Crowell, 374 F.3d 790, 792 (9th Cir. 2004) (citing Rogers v. Slaughter, 469 F.2d 1084, 1085 (5th Cir. 1972)). When defendants move to have their records expunged they are requesting that the court destroy or seal the records of their conviction and not the actual conviction itself. Crowell, 374 F.3d at 792; see also United States v. Sweeney, 915 F.2d 1260, 1262 (9th Cir. 1990) ("[A]n expunction order is similar to an order not to report a conviction."). Without more, expungement "does not alter the legality of the previous conviction and does not signify that the defendant was innocent of the crime to which he pleaded guilty." Id. (quoting Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 121-22 (1983)).

In Crowell, the Ninth Circuit recognized two sources of authority by which federal courts may expunge criminal records: statutes and the federal court's inherent authority. Crowell, 374 F.3d at 792. By statutes, Congress has established certain conditions by which the courts may expunge federal criminal records but only in specific cases. Id. For example, Congress has declared that those who are convicted and sentenced to probation for violating the Controlled Substances Act, 21 U.S.C. § 844, and

1  were less than twenty-one years of age at the time the offense was
2  committed, may be granted expungement. Id. Under these
3  circumstances, Congress has not only placed specific conditions on
4  expungement but has also established the legal effect of such
5  expungement. Id. at 792-93.

6      Congress has not expressly granted the federal courts a
7  general power to expunge criminal records. Id. at 793. The Ninth
8  Circuit has held that, in criminal proceedings, federal courts
9  possess ancillary jurisdiction to expunge criminal records.
10 Sumner, 226 F.3d 1005, 1014 (9th Cir. 2000). Ancillary
11 jurisdiction flows from the congressional grant of jurisdiction to
12 hear cases involving offenses against the United States under 18
13 U.S.C. § 3231. Id. The ancillary jurisdiction of the federal
14 courts is "limited to expunging the records of an unlawful arrest
15 or conviction, or to correcting a clerical error." Id. The reason
16 for this is that "the expungement of the record of a valid arrest
17 and conviction usurps the powers of the framers of the
18 Constitution allocated to Congress, the Executive, and the
19 states." Id. However, "even where a conviction has been held
20 unlawful and vacated, expungement remains a 'narrow, extraordinary
21 exception,' one 'appropriately used only in extreme
22 circumstances.'" Crowell, 374 F.3d at 796 (quoting Smith, 940 F.2d
23 395, 396 (9th Cir. 1991)(per curiam)).

24 **III. Discussion**

25      A. Unlawful Arrest

26      This Court's ancillary jurisdiction is limited to expunging
27 unlawful arrests or to correcting clerical errors. Sumner, 226
28 F.3d at 1014. Petitioners have not alleged that the records they

seek to be expunged resulted from any clerical error; therefore, this Court must determine whether expungement is appropriate because Petitioners's arrest was unlawful. Id. Unlawful arrest claims are cognizable under 42 U.S.C. § 1983 as violations of the Fourth Amendment provided the arrests were made without probable cause or other justification. Dubner v. City & Cnty. of S.F., 266 F.3d 959, 966 (9th Cir. 2001).

While Petitioners assert in their motion that their arrests by self-surrender on August 16, 2005, were deemed unlawful as the product of a "malicious prosecution and gross government misconduct" (Docket No. 88, at 7), there is no evidence showing this assertion to be true. Petitioners brought a civil suit against the United States that included claims for malicious prosecution and abuse of process. Though the civil suit left open the possibility that the manner in which the search warrant was executed on the Davis residence was unlawful as an abuse of process, there is no indication that either the grand jury indictment or Petitioners' eventual arrest by self-surrender was unlawful.

The only cognizable interest defendants have in grand jury proceedings is to have a "legally constituted grand jury make an informed and independent evaluation of the evidence to determine if there is probable cause." United States v. Sears, Roebuck & Co., 719 F.2d 1386, 1391 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079. It is the function of the grand jury to determine whether the evidence presented in a specific case is sufficient to establish probable cause to believe that a crime was committed and that a specific individual committed that crime. Bracy v. United

1  States, 435 U.S. 1301, 1302 (1978). Petitioners have not raised an

2  issue as to the validity of their grand jury indictment. As a

3  result, Petitioners have not shown that the warrant issued for

4  their arrests was issued unlawfully. Nor have Petitioners shown

5  that their arrest by self-surrender was unlawful. And while the

6  civil case left open the possibility that the manner in which the

7  August 2005 warrant was executed was unlawful, the parties settled

8  the action before the legality of that search could be determined.

9  Therefore, the Court concludes that Petitioners' have not shown

10 that their arrests by self-surrender were unlawful, as probable

11 cause to arrest and prosecute Petitioners existed. Therefore,

12 Petitioners' Motion cannot be granted on the basis that their

13 arrests in this case were unlawful.

14       B. Extraordinary Circumstances

15       As discussed above, Petitioner's arrests were not found to be

16 unlawful and therefore cannot meet the Ninth Circuit's

17 requirements for expungement. However, given the extent to which

18 Petitioners argue the equities in this case, the Court will

19 address them. Even when a petitioner's arrest has been deemed

20 unlawful, expungement remains a "'narrow, extraordinary

21 exception,' one 'appropriately used only in extreme

22 circumstances.'" Crowell, 374 F.3d at 796 (quoting Smith, 940 F.2d

23 395, 396 (9th Cir. 1991)). Therefore, even if the Davises could

24 show that their arrests were unlawful, they would also have to

25 show "circumstances extraordinary and unusual enough [to] merit

26 expungement" of their criminal records. Crowell, 374 F.3d at 796.[4]

27 _____

28       [4]Even where expungement of judicial records is deemed

                                             (continued...)

1    In their Motion, Petitioners argue that the arrest records
2  they wish to expunge would limit their future employment
3  opportunities. (Docket No. 88, at 14). In doing so, Petitioners
4  assert that Julia aspires to be an attorney while BJ "needs
5  to continue to be a bondable and bankable" producer and member of
6  the Academy of Television Arts and Sciences (the "Academy"). (Id.)
7  Yet Petitioners fail to set forth any evidence demonstrating that
8  their employment opportunities have in fact been negatively
9  hindered by the records they seek to have expunged. To date, BJ
10 continues to be a producing member of the Academy, and there is no
11 indication that Julia has encountered any difficulty thus far in
12 pursuing her potential career as an attorney.

13   Further, even if Petitioners had provided this Court with
14 such documentation, the Ninth Circuit does not recognize
15 employment problems resulting from criminal records as being
16 "sufficient to outweigh the government's interest in maintaining
17 criminal records." United States v. Smith, 940 F.2d 395, 396 (9th
18 Cir. 1991). According to the Ninth Circuit, if it recognized
19 employment problems as a proper reason to grant Petitioners'
20 Motion, "expunction would no longer be the narrow, extraordinary

21

22         4(...continued)
23 appropriate, expungement of executive records may not be. While
   federal courts maintain control over judicial records (i.e., the
24 grand jury indictment), Congress has directed the executive
   maintain particular records. See e.g. 28 U.S.C. § 534(a)(1)(1994)
25 ("The Attorney General shall acquire, collect, classify and
   preserve identification, criminal identification, crime, and other
26 records"). District courts do not control executive records through
   ancillary jurisdiction any more than the executive, through its
27 pardon power, may order the expungement of judicial records. See
   United States v. Noonan, 906 F.2d 952 (3rd Cir. 1990). Therefore,
28 records of Petitioners' arrests may not be the subject to
   expungement by this Court.

1    exception, but a generally available remedy." <u>Id.</u> Nor is there any

2    federal statute in which Congress has "empowered a district court

3    to reopen a criminal case after its judgment has become final" for

4    purposes of expunging a valid arrest record to "enhance a

5    defendant's employment opportunities." <u>Sumner</u>, 226 F.3d at 1014.

6    Therefore, the Court finds that Petitioners have not demonstrated

7    that they are entitled to the "extraordinary remedy" of

8    expungement.

9         C. <u>Dismissal of Charges</u>

10        While this Court recognizes that on March 7, 2006, the

11   government dismissed its criminal complaint against Petitioners,

12   this fact alone does not compel expungement of their arrest

13   records. While the Ninth Circuit has yet to hear a case wherein

14   the government voluntarily dismissed a criminal complaint against

15   defendants now seeking expungement, other circuits have heard

16   similar cases. The D.C. Circuit held that neither the dismissal of

17   a complaint nor acquittal, without more, would justify the

18   expungement of arrest records. <u>Livingston v. U.S. Dep't of</u>

19   <u>Justice</u>, 759 F.2d 74, 78 (D.C. Cir. 1985); <u>see also</u> <u>United States</u>

20   <u>v. Friesen</u>, 853 F.2d 816 (10th Cir. 1988) (attorney acquitted on

21   all counts of conspiracy to manufacture cocaine was not

22   automatically entitled to expungement of records); <u>United States</u>

23   <u>v. Noonan</u>, 906 F.2d 952 (3rd Cir. 1990) (person formally convicted

24   was not entitled to expunction upon receiving presidential

25   pardon); <u>United States v. Linn</u>, 513 F.2d 925 (10th Cir. 1975)

26   (defendant acquitted of all counts against him by a jury was not

27   entitled to expungement of his arrest records). Therefore, the

28   fact that the government voluntarily dismissed its criminal

complaint against Petitioners, without more, is not a sufficient
basis for granting Petitioners' motion for expungement.

**IV.   Conclusion**

For the foregoing reasons, Petitioners' Motion Expunge, Seal
and Destroy is DENIED.


IT IS SO ORDERED.


Dated: March 10, 2014

DEAN D. PREGERSON
United States District Judge